# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 28

### OCTOBER TERM, A.D. 2014

February 25, 2015

MICHAEL ALLAN LINDSTROM,

Appellant
(Defendant),

v.

S-14-0184

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Johnson County*
The Honorable William J. Edelman, Judge

*Representing Appellant:*
Office of the Public Defender: Diane M. Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; Kirk A. Morgan, Senior Assistant Appellate Counsel. Argument by Mr. Morgan.

*Representing Appellee:*
Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Jenny Lynn Craig, Senior Assistant Attorney General; Caitlin F. Young, Assistant Attorney General. Argument by Ms. Young.

*Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.

**KITE, Justice.**

[¶1]  A jury found Michael Allan Lindstrom guilty of three counts of first degree sexual abuse of a minor and three counts of second degree sexual abuse of a minor for acts involving two victims.  The jury also found him guilty of two counts of aggravated assault and two counts of first degree sexual assault for acts involving an adult victim.  He appeals claiming the district court abused its discretion when it allowed the State to introduce un-noticed character evidence and amend the information to conform to one of the minor victim's video deposition testimony.  He also contends the cumulative effect of two instances of prosecutorial misconduct denied him his right to a fair trial.  We affirm.

## ISSUES

[¶2]  The issues for our determination are:

> 1.      Whether the district court abused its discretion in allowing the State to present character evidence without proper notice or a *Gleason* hearing.

> 2.      Whether the district court abused its discretion when it allowed the State to amend the information to bring it into conformity with the minor victim's video deposition.

> 3.      Whether Mr. Lindstrom was denied his right to a fair trial due to prosecutorial misconduct.

## FACTS

[¶3]  In October 2012, Kari Packard, a caseworker with the Wyoming Department of Family Services (DFS), contacted the Buffalo Police Department after six year old CS, Mr. Lindstrom's second cousin, drew a picture of a naked male and made statements suggesting Mr. Lindstrom had been sexually inappropriate with her.  Ms. Packard subsequently interviewed CS in Casper.  During the interview, CS stated that Mr. Lindstrom touched her in sexual ways while they were at her great grandmother's home in Buffalo.  In a follow-up interview with the caseworker and Buffalo police officer Adrian Keeler, CS again reported that Mr. Lindstrom had touched her in sexual ways.

[¶4]  In February 2013, in the course of investigating a separate matter, Officer Keeler interviewed TR.  TR told the officer that Mr. Lindstrom, with whom she had previously had a relationship resulting in the birth of a son, had been at her home several times during the summer and fall of 2012 and had raped her.

[¶5]  In March 2013, Officer Keeler spoke with Mr. Lindstrom.  He denied having been in Buffalo except on August 18, 2012, when his parole officer gave him a travel pass.

1

According to the police officer, he interviewed other individuals who said they had seen Mr. Lindstrom in Buffalo several times in the summer and fall of 2012. Officer Keeler and caseworker Packard then re-interviewed TR. TR reiterated that Mr. Lindstrom had been at her home several times in 2012 and had sexually assaulted her. During this interview, she also stated the Mr. Lindstrom had sexually assaulted their son, PR.

[¶6] In July of 2013, the Johnson County attorney's office issued a warrant for Mr. Lindstrom's arrest and charged him with two counts of first degree sexual abuse of a minor in violation of Wyo. Stat. Ann. § 6-2-314(a)(i) and (c) (LexisNexis 2013) and two counts of second degree sexual abuse of a minor in violation of Wyo. Stat. Ann. § 6-2-315(a)(ii) and (b) (LexisNexis 2013) for acts involving CS; three counts of first degree sexual assault in violation of Wyo. Stat. Ann. § 6-2-302(a)(i) (LexisNexis 2013) and two counts of aggravated assault in violation of Wyo. Stat. Ann. § 6-2-502(a)(iii) (LexisNexis 2013) for the acts involving TR; and one count of first degree sexual abuse of a minor and one count of second degree sexual abuse of a minor for the acts involving PR. Prior to trial, the State filed and the district court granted a motion to dismiss one of the sexual assault charges involving TR.

[¶7] Also before trial, the State moved for an order allowing the testimony of CS and PR to be taken by videotape deposition so they would not have to meet Mr. Lindstrom face-to-face in the courtroom. Mr. Lindstrom filed a motion for a competency and taint hearing. Prior to a hearing on the motions, the parties filed a stipulated motion stating that PR had been placed in acute care and was not capable of testifying and requesting that in CS's best interest her competency hearing and trial deposition be scheduled for the same day so that she would have to appear only once. The district court granted the motion and set the matter for a competency/taint hearing and videotape deposition on November 12, 2013. After the hearing, the district court found the child competent to testify and the parties proceeded with the trial deposition. During the deposition, CS testified that Mr. Lindstrom had on different occasions inserted his finger in her anus several times, made her touch his penis and made her perform fellatio on him.

[¶8] TR testified that Mr. Lindstrom came to her home in June 2012. They sat on the couch making small talk and watching PR play. Mr. Lindstrom asked TR if they could be in a relationship again, TR said no and he asked if he could at least "get a piece of ass." She again said no and Mr. Lindstrom called her a bitch. TR took PR to his room and Mr. Lindstrom followed. PR began to show Mr. Lindstrom his room and his toys. After watching them for a few minutes, TR left them alone.

[¶9] TR came back to the room about thirty minutes later when she heard PR say, "I don't want to do that." The door was shut, she opened it and she saw Mr. Lindstrom and PR in PR's bed. TR testified that it looked like Mr. Lindstrom was pulling up his pants and PR's pants. She asked them what they were doing and Mr. Lindstrom said they were watching a movie. PR ran to her and grabbed hold of her waist. He was trembling. She

picked him up and he whispered in her ear that Mr. Lindstrom had made him touch his penis and pretend it was a Popsicle. She asked Mr. Lindstrom what he had done and he denied doing anything. They argued and she told Mr. Lindstrom that he needed to leave.

[¶10] TR threatened to call the police and, carrying PR, headed to her bedroom to get her cell phone. She made it to the bathroom, put PR down and told him to go in the bathroom and lock the door. Mr. Lindstrom followed her, grabbed her around the throat and said if she told anyone he would kill her. He shoved her against the wall and told PR to open the bathroom door. PR complied and Mr. Lindstrom told TR to go into the bathroom. Mr. Lindstrom made TR perform fellatio on him and then told her to touch PR's penis. She refused and he slapped her. She hit him in the face and he began pulling down her pants and underwear. He grabbed PR's hand and told him to touch her. She pushed PR's hand away. Mr. Lindstrom forced her head down onto his penis. Then he held a Swiss army knife to her throat and told her to do the same thing to PR or he would kill her. After she complied, Mr. Lindstrom made TR and PR get into the shower and he urinated on TR. Mr. Lindstrom then got dressed and stepped out of the bathroom. TR locked the door. Mr. Lindstrom pounded on the door, cussing and yelling that he was going to kill TR. Finally, Mr. Lindstrom left the house.

[¶11] TR testified that Mr. Lindstrom came back to her home in September 2012. They argued and Mr. Lindstrom pushed her against the wall, held the knife to her throat and again threatened to kill her if she told anyone what he had done. She testified that Mr. Lindstrom returned in late December or early January. Again they argued and Mr. Lindstrom became angry and physically and sexually assaulted TR. He then bound PR's hands with electrical tape and sexually assaulted him.

[¶12] In addition to CS and TR, the State also presented the testimony of DFS employees and police officers who were involved in investigating the allegations against Mr. Lindstrom. Their testimony about their interviews with CS, PR and TR tended to corroborate the allegations of child abuse and sexual assault. The State also presented expert testimony tending to show that CS's behavior was consistent with that of a child who had been sexually abused.

[¶13] After a five day trial, the jury found Mr. Lindstrom guilty on the ten remaining counts. The district court sentenced him to six terms of life in prison without the possibility of parole on the convictions for first and second degree sexual abuse of a minor, with the first three sentences to be served concurrently to each other and the last three sentences to be served concurrently to each other and consecutively to the first three. The district court sentenced Mr. Lindstrom to four terms of forty to fifty years imprisonment on the convictions for first degree sexual assault and aggravated assault and battery with those sentences to be served concurrently to each other and consecutively to the six life sentences. Mr. Lindstrom appealed.

3

## DISCUSSION

### *1. Admissibility of evidence found in Mr. Lindstrom's apartment.*

[¶14] Prior to trial, Mr. Lindstrom filed a demand for notice of the State's intent to use evidence falling within W.R.E. 404(b). In response, the State identified various items of evidence. The district court convened a hearing and ruled all of the designated evidence inadmissible. In its pretrial memorandum, the State listed two witnesses whom it intended to call to testify about finding little girls' and women's underwear in the apartment in Casper where Mr. Lindstrom was living at the time of his arrest—evidence the State did not identify in its 404(b) disclosure and not considered by the district court at the 404(b) hearing. When the State called the first of the two witnesses during trial, defense counsel objected on the ground that the testimony was character evidence having no relationship to the crimes charged and was more prejudicial than probative. The district court overruled the objection. Both witnesses testified that they found women's and girls' underwear and clothes in two dresser drawers in Mr. Lindstrom's Casper apartment.

[¶15] Mr. Lindstrom asserts the district court abused its discretion when it allowed the testimony concerning the items found in his Casper apartment. He argues the evidence was character evidence and was not admissible because it served none of the purposes for which such evidence may be admitted under W.R.E. 404(b). He further contends the district court erred in not analyzing the issue in accordance with the mandatory procedure outlined in *Gleason v. State*, 2002 WY 161, ¶ 18, 57 P.3d 332, 340 (Wyo. 2002) prior to allowing the evidence.

[¶16] The State agrees the evidence at issue was character evidence. The State asserts, however, the evidence did not involve uncharged misconduct; therefore, neither Rule 404(b) nor *Gleason* applies. Alternatively, the State contends admission of the evidence was harmless.

[¶17] Given Mr. Lindstrom's objection at trial to admission of the evidence, we review its admissibility under the abuse of discretion standard. *Payseno v. State*, 2014 WY 108, ¶ 20, 332 P.3d 1176, 1182 (Wyo. 2014), citing *Cazier v. State*, 2006 WY 153, ¶ 10, 148 P.3d 23, 28 (Wyo. 2006).

> A trial court's decision on the admissibility of evidence is entitled to considerable deference, and will not be reversed on appeal unless the appellant demonstrates a clear abuse of discretion. As long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal.

*Payseno*, ¶ 20, 332 P.3d at 1182, citing *Nelson v. State*, 2010 WY 159, ¶ 29, 245 P.3d 282, 289 (Wyo. 2010).

[¶18] Evidence of a propensity toward sexual deviation is character evidence. *McDowell v. State*, 2014 WY 21, ¶ 17, 318 P.23d 352, 358 (Wyo. 2014), citing *Gruwell v. State*, 2011 WY 67, ¶ 31, 254 P.3d 223, 233 (Wyo. 2011). Similarly, evidence portraying a defendant as having a perverted lifestyle is character evidence the admission of which is governed by W.R.E. 404(b). *Wilde v. State*, 2003 WY 93, ¶ 21, 74 P.3d 699, 710 (Wyo. 2003). Rule 404(b) states:

> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

[¶19] Pursuant to this provision, evidence of the underwear found in Mr. Lindstrom's dresser drawers was not admissible to prove that he had a propensity toward sexually deviant behavior and acted in conformity with that propensity by sexually abusing the minor victims and sexually assaulting the adult victim in this case. The evidence introduced by the State was only admissible if relevant, offered for one of the purposes identified in subparagraph (b) and more probative than prejudicial.

[¶20] The State argues the evidence did not fall under subparagraph (b) because it was not uncharged misconduct. This argument has no merit. The character evidence falling under the umbrella of Rule 404(b) is not limited to uncharged misconduct. The rule addresses evidence of other crimes, wrongs, or "acts." As noted in 1 Mueller & Kirkpatrick, Federal Evidence § 4:28 (4th ed.2013):

> So often are the acts *crimes* by the defendant that have led to *conviction*, and so often do they *precede* the charged offense, that it is easy to think of Rule 404(b) as a "prior crimes" or "prior convictions" rule, but it is important to note that rule 404(b) is much broader than this description suggests. To begin with, we are talking about acts, so it does not matter whether they led to charges or convictions. . . .

5

> What is important is the nature or quality of the prior act, not its criminality.
>
> Thus the act, and it is almost always a misdeed of some sort, need not be criminal . . . .

The character evidence the State introduced in this case fell within 404(b).

[¶21] Because the evidence was character evidence within the scope of 404(b), upon the filing of Mr. Lindstrom's pretrial demand for notice of intent to introduce 404(b) evidence, the State was required to identify the evidence. The district court was then required to hold a pretrial hearing at which time the State was required to justify the evidence as proper under W.R.E. 404(b), relevant, and more probative than unfairly prejudicial. *Payseno,* ¶ 19, 332 P.3d at 1182, citing *Gleason,* ¶ 18, 57 P.3d at 340. The district court was then required to conduct the exacting analysis set forth in *Gleason. Gleason,* ¶ 24, 57 P.3d at 342-343. None of this happened with respect to the evidence at issue. The State did not identify the underwear found in Mr. Lindstrom's apartment in its 404(b) notice. The State did not show the evidence was introduced for a proper purpose, was relevant, or was more probative than unfairly prejudicial. The district court did not apply the *Gleason* factors in ruling the evidence was admissible. Under these circumstances, the district court committed a clear abuse of discretion when it admitted the evidence.

[¶22] Our conclusion that the district court abused its discretion in admitting the evidence does not end the inquiry. We still must determine whether the error was prejudicial.

> Even if the district court admitted evidence in error, we must consider whether the error was prejudicial or harmless. Error is prejudicial if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had not been made. Prejudicial error requires reversal, while harmless error does not.

*Payseno,* ¶ 20, 332 P.3d at 1182, citing *Nelson v. State,* 2010 WY 159, ¶ 29, 245 P.3d 282, 289 (Wyo. 2010).

[¶23] Given the magnitude of the evidence against Mr. Lindstrom, including the testimony of CS and TR detailing the acts he engaged in with them and the second minor victim, we conclude there is no reasonable possibility that the verdict would have been more favorable to him if the testimony concerning the items found in his dresser drawers

6

had not been admitted.[1]  CS testified that on several occasions Mr. Lindstrom inserted his finger in her anus.  She testified he made her touch his penis on another occasion.  She testified that on still another occasion he made her perform fellatio on him.  TR testified that Mr. Lindstrom sexually abused PR on two occasions.  She further testified that he violently sexually assaulted her in front of PR on two occasions and on one occasion forced her to involve PR in sexual acts.  The error in admitting testimony about what was in Mr. Lindstrom's dresser drawers was harmless.

## 2. *Amendment of the information.*

[¶24] In the original information, the facts alleged in support of Counts I, II and III respectively were that Mr. Lindstrom inserted his finger into CS's genital opening, performed cunnilingus on CS and put his mouth on her breast.  In her trial deposition, however, CS testified that on different occasions Mr. Lindstrom inserted his finger into her anus, made her perform fellatio on him, and made her touch his penis, acts that were not alleged in the information.  During the deposition, defense counsel cross-examined CS but did not ask about the acts alleged in the information.

[¶25]  Two days after the deposition, on November 14, 2013, the State filed a motion to amend the information to conform to CS's deposition testimony.  Specifically, the State sought to amend Count I to change the specifics of the crime from "inserting a digit into the genital opening of CS" to "inserting a digit into the anal opening of CS"; Count II to change "did perform cunnilingus on CS" to "did cause CS to perform fellatio on him"; and Count III to change "did put his mouth on the breast of CS" to "did cause CS to touch his penis."  Without a hearing, the district court granted the motion the same day.  On November 18, Mr. Lindstrom filed his objection to the amendment, arguing that allowing the State to allege new facts after CS's trial testimony was completed prejudiced his right to a fair trial and to prepare his defense.  The district court entered another order allowing the amendment.

[¶26]  Mr. Lindstrom contends the district court erred when it allowed the State to amend the information to conform to the testimony CS gave during her videotaped trial deposition.  He asserts the amendment, allowed after the witness's trial testimony had concluded, violated his constitutional due process rights to be informed of the charges against him and to prepare a defense.  Ordinarily, we review a district court order allowing the State to amend an information for abuse of discretion. *Walker v. State*, 2013 WY 58, ¶ 20, 302 P.3d 182, 187 (Wyo. 2013).  When an accused asserts a due process violation, however, our review is *de novo*. *Albarran v. State*, 2013 WY 111, ¶ 11, 309 P.3d 817, 820 (Wyo. 2013).

---

[1] We can conceive of no rational basis for introducing the items found in the apartment.  Even assuming Mr. Lindstrom lived alone and the presence of female underwear in his dresser drawers was unusual, its presence there by itself was not even arguably relevant. The only sure consequence of the introduction of such clearly inadmissible evidence was an appeal.

[¶27] W.R.Cr.P. 3(e) provides in pertinent part:

> . . . The court may permit an information or citation to be amended:
>
>> (1) With the defendant's consent, at any time before sentencing.
>>
>> (2) Whether or not the defendant consents:
>>
>>> (A) At any time before trial if substantial rights of the defendant are not prejudiced.
>>>
>>> (B) At any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced.

The amendment in the present case did not allege additional or different offenses; it alleged different facts for the same offenses charged in the first information. Therefore, we are concerned only with whether the amendment prejudiced Mr. Lindstrom's substantial rights.

[¶28] The timing of an amendment is often a key factor in assessing prejudice. 5 Wayne R. LaFave, Jerold H. Israel, Nancy J. King and Orin S. Kerr, Criminal Procedure § 19.5(b), 311 (3d ed. 2007). The trial deposition in which CS testified to different facts than those the State had alleged in the information was taken on November 12, 2013, a month before trial. The State moved to amend the information to conform to the testimony two days later on November 14. The district court granted the motion without a hearing the same day, again nearly a month before trial. In his objection to the amendment filed thereafter, or at any time prior to the December 12 trial date, Mr. Lindstrom could, and should, have requested a continuance of the trial if he believed the amendment prejudiced his ability to prepare his defense. He did not ask for a continuance. Prejudice from amendments to an information made prior to trial may be avoided by obtaining a continuance and "courts are hesitant to find prejudice if a continuance was … not requested." *Id.*

[¶29] Additionally, Mr. Lindstrom's defense to the crimes charged was that he did not commit them and could not have committed them because he was not in Buffalo when they allegedly occurred. That CS's description of the sexual contact in her testimony was different than that alleged in the information had no effect on that defense. With the amendment, Mr. Lindstrom still attempted to prove he was not in Buffalo when the offenses occurred and could not, therefore, have committed them. Under these circumstances, the amendment did not prejudice his defense.

### 3. *Prosecutorial misconduct.*

[¶30] In his closing argument, the prosecuting attorney stated:

> But what about C? C doesn't hallucinate. C doesn't fantasize. C doesn't make up wild stories. C is a bright child. . . . . She knows what's real, she knows what's not, she knows what's happening.

He also stated:

> But we don't have psychosis. This is real, Ladies and Gentlemen. This isn't fantasy. This is not something that was made up.
> Think of the effort it would take to put that together.
> "I'm going to make this up. I'm going to teach this child – these children how to play in a way that makes it look like Mike Lindstrom did something wrong."
> You can't teach a child to do that. You can't teach two separate children from two separate families to pick on this guy.

[¶31] Mr. Lindstrom asserts that in these remarks the prosecutor improperly vouched for the credibility of CS and PR. Mr. Lindstrom did not object to the prosecutor's statements; therefore, we review his allegations of prosecutorial misconduct for plain error. *Anderson v. State,* 2014 WY 74, ¶ 40, 327 P.3d 89, 99 (Wyo. 2014). Plain error exists when: 1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right resulting in material prejudice. *Id.*, citing *Sweet v. State,* 2010 WY 87, ¶ 22, 234 P.3d 1193, 1202 (Wyo. 2010) (quoting *Schreibvogel v. State,* 2010 WY 45, ¶ 19, 228 P.3d 874, 882 (Wyo. 2010)). Reversal as a result of prosecutorial misconduct is not warranted unless a reasonable probability exists that absent the error the defendant may have enjoyed a more favorable verdict. *Anderson,* ¶ 40, 327 P.3d at 100.

[¶32] The first prong of plain error is satisfied. The prosecutor's remarks clearly appear in the record. Whether there was a transgression of a clear and unequivocal rule of law is not so quickly answered. We have said:

> Counsel are allowed wide latitude during the scope of their closing arguments, and a prosecutor may comment on all of the evidence in the record and suggest reasonable inferences from that evidence. However, the prosecutor may not inflame or mislead the jury or express his personal beliefs or opinions about the evidence. *Davis v. State*, 2005 WY 93, ¶ 25, 117

9

P.3d 454, 463 (Wyo. 2005). Similarly, a prosecutor cannot personally vouch for the credibility of a state's witness, nor can a prosecutor assert his own credibility as a basis for conviction of a defendant.

> [W]hen the prosecutor asserts his credibility or personal belief, an additional factor is injected into the case. This additional factor is that counsel may be perceived by the jury as an authority whose opinion carries greater weight than their own opinion; that members of the jury might be persuaded not by the evidence, but rather by a perception that counsel's opinions are correct because of his position as prosecutor, an important state official entrusted with enforcing the criminal laws of a sovereign state. While the prosecutor is expected to be an advocate, he may not exploit his position to induce a jury to disregard the evidence or misapply the law.

*Budig v. State*, 2010 WY 1, ¶ 17, 222 P.3d 148, 156 (Wyo. 2010), quoting *Condra v. State,* 2004 WY 131, ¶ 11, 100 P.3d 386, 390 (Wyo. 2004).

[¶33] Applying these principles in *Dysthe v. State*, 2003 WY 20, ¶¶ 28-29, 63 P.3d 875, 886 (Wyo. 2003), we held the prosecutor improperly vouched for the credibility of the State's witnesses in a drug case when he said:

> "These witnesses, despite the fact that they are users, were credible. They were very credible. They were more credible because of the very fact that they have a relationship with this Defendant. More credible because, if you couldn't tell, I certainly could; they didn't like me asking them questions. They didn't want to be telling me anything."

> The prosecutor also stated that he worked with the investigators on the case and he could "guarantee" that their investigations were not "arbitrary." He told the jury that the witnesses had no reason to lie.

We concluded:

> the prosecutor's comments in the present case crossed the line between legitimate argument and illegitimate vouching for the credibility of the State's witnesses. While he did not directly state that it was his opinion that the witnesses were

10

credible, he certainly gave that impression. Further, he did not suggest that the determination was to be made by the jurors; instead, he offered his own observation that the witnesses were "more credible" because "if you couldn't tell, I certainly could [that] they didn't like me asking them questions." And finally, his personal guarantee that the investigation was not arbitrary certainly amounted to a personal attestation of fact.

*Id.*, ¶ 30, 63 P.3d at 886.

[¶34] In contrast, in *Teniente v. State*, 2007 WY 165, ¶ 31 169 P.3d 512, 525 (Wyo. 2007) we held the prosecutor did not improperly vouch for a witness's credibility when he said:

[W]e have one eyewitness, one eyewitness that stepped up to the plate February 18th, and said, 'I was there. This is what happened.' A statement as, you know, he has stayed consistent with, a statement he testified to in Eddie's trial.

As you notice, when [Defense counsel] went to question him, he couldn't impeach him on any of his prior inconsistent statements because there weren't any. He has stayed consistent, ladies and gentlemen, even in the face of threats from his family, ostracism by his family.

He saw what happened, and he decided to step forward and tell the truth, even though the first time, it's against his very own brother, and now the second time, against his cousin. Courage.

We concluded that rather than vouching for the witness's credibility, the prosecutor "was arguing reasonable inferences, drawn from evidence introduced at trial, that the witness's testimony could be seen as reliable." *Id*.

[¶35] We find the prosecutor's comments in the present case to be more like those the prosecutor made in *Teniente* than in *Dysthe*. His comments that CS doesn't hallucinate, fantasize or make up wild stories and is a bright child were direct quotes from the testimony of CS's mother. His statements that CS knows what is real and what is not and that the stories were not made up were reasonable inferences to be drawn from her mother's testimony. The prosecutor's statement that it would be difficult to get two children from different families to make up stories about Mr. Lindstrom continued as follows:

11

[Mr. Lindstrom] is the common connection between [the] two. The children aren't the same age, they are not in the same grade, they don't hang out together. They're tied together … with Mr. Lindstrom.

These statements were a reasonable response to the defense's efforts to show that the children were manipulated by adults to accuse Mr. Lindstrom. We conclude the prosecutor did not improperly vouch for the witness's credibility.

[¶36] We affirm Mr. Lindstrom's convictions.