# IN THE SUPREME COURT, STATE OF WYOMING

## 2023 WY 60

### APRIL TERM, A.D. 2023

### June 9, 2023

TAYLOR SCOTT MEECE,

Appellant
(Defendant),

v.

S-22-0249

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Campbell County*
*The Honorable James Michael Causey, Judge*

*Representing Appellant:*

Office of the State Public Defender: Diane Lozano, Wyoming State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Robin S. Cooper, Senior Assistant Appellate Counsel.

*Representing Appellee:*

Bridget Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; and John J. Woykovsky, Senior Assistant Attorney General.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Chief Justice.**

[¶1]   A jury convicted Taylor Scott Meece of two counts of second-degree sexual abuse of a minor. On appeal he contends the prosecutor committed prosecutorial misconduct by misusing a forensic interviewer's testimony in his opening statement and closing argument. We find no misconduct and affirm.

## *ISSUE*

[¶2]   The sole issue on appeal is whether the prosecutor committed misconduct in the way he referred to and used the testimony of a forensic interviewer in his opening statement and closing argument.

## *FACTS*

[¶3]   RR was born in February 2010. During the years 2017 to 2019, she lived with her grandfather in Gillette, Wyoming along with her younger brother, her mother, and her mother's then-boyfriend, Taylor Meece. RR's parents had known Mr. Meece since they were teenagers, so RR had known him her entire life. She got along well with him, called him "Uncle Shorty," and considered him a "bonus dad" when her mother started dating him.

[¶4]   One night in 2017 or 2018, RR was lying in bed trying to sleep when Mr. Meece entered her bedroom and laid down in bed next to her. He unzipped his pants, took her right hand, and masturbated while holding her hand around his penis. He did that for a couple of minutes and then reached under her pajamas and underwear and rubbed her vagina with his fingers for a couple of minutes. He then got up and left. RR recalled that she was scared, pretended to be asleep while it was happening, and did not understand what had happened or know what to do.

[¶5]   RR became withdrawn and less talkative after the incident. About a year later, she told her younger brother MR what happened but made him promise not to tell anyone because she was scared something else would happen. MR recalled that RR "said it might have been [Mr. Meece], but she doesn't really know." He also recalled that she was crying and begged him not to tell their parents.

[¶6]   Sometime after telling her brother what had happened, RR told her soon-to-be stepsister LW. In March 2021, RR told LW's mother, CB, about the incident while they were at a family gathering. CB told RR she needed to tell her mother, who was attending the same event, and took RR to her. RR told her mother, who told RR's father, and RR's father took RR to the Gillette Police Department to report the incident. About a month later, a forensic interviewer, Brandi Tonkel, interviewed RR about the incident.

1

[¶7]    The State charged Mr. Meece with two counts of second-degree sexual abuse of a minor. In its pretrial submission, it listed Ms. Tonkel as a witness, stating she "may testify regarding her education, training and experience in the area of forensic interviewing, her interview of the victim in this case, consistent with her report and CD of said interview." Shortly before the pretrial conference, Mr. Meece filed a motion asking that the State be required to provide the defense a written expert report from Ms. Tonkel.

[¶8]    At the pretrial conference, the State objected to providing the requested report. It pointed out defense counsel was relying on the rule for retained experts. The State contended it had not retained Ms. Tonkel as an expert for trial but was instead calling her as a fact witness. It asserted Ms. Tonkel would not be testifying to any opinions about matters in the case or offering any ultimate conclusions. Concerning her expertise, the State argued:

> [T]he State is not offering her, per se, as an expert witness; moreover, she does have an area of expertise, that's why we provided the curriculum vitae to the defense, we've provided the reports and [defense counsel] could see that. We're not going after opinions at this time. Now, if there's cross-examination, that could change things, I – I don't believe we're quite there yet.

[¶9]    The district court took Mr. Meece's motion under advisement and then issued a written order denying it. The court reasoned:

> In this case, the Defendant has been provided with Ms. Tonkel's curriculum vitae, interview report, and a copy of the interview. The State has declared that it does not intend to elicit expert opinion testimony from Ms. Tonkel, and it further does not appear as though her proposed testimony is of the type which requires an expert report to be prepared.

[¶10]  At trial, the State elicited the following testimony from Ms. Tonkel over defense counsel's objection:

> Q.    So, Ms. Tonkel, what is your understanding of what a delayed disclosure is?
>
> A.    So a delay in disclosure would be based on research as well as what we see in practice that children will often wait to tell, and between 25 and 30 percent of child abuse victims will never tell. And the average age of disclosure is 55, and

that's a national average. So what we know is that most children will delay a disclosure.

Q. In other words, something happens to the child and they don't immediately go and tell, is that as simple of what a delayed disclosure is at its most elemental level?

A. Yes; so that could be hours, days, years, again, a lifetime.

[¶11] On cross-examination, defense counsel followed up on Ms. Tonkel's testimony concerning delayed disclosure:

Q. You talked a little bit about sometimes in your experience, children's – children will wait to tell you – you talked about a little bit about delayed disclosures; do you remember that?

A. In practice and in research, yes.

Q. Okay.

And one of the things that can be a predictor for when a child might disclose is safety; is that right?

A. Yes.

Q. So once the perpetrator no longer lives in the house, that – that would be a piece that could keep them safe, maybe?

A. Physical safety.

[¶12] On redirect, the prosecutor elicited further testimony, without objection, detailing the myriad reasons a child might delay disclosure, along with an explanation. Those reasons included: the relationship between the child and offender; social and developmental factors (not understanding sex and the need to tell); fear of not being believed; and fear of what may happen to the offender and the victim's family.

[¶13] In the State's closing argument, the prosecutor did not discuss or refer to Ms. Tonkel's testimony concerning delayed disclosure. Defense counsel then argued in closing:

You heard from Brandi Tonkel. She's great on the witness stand, there was no doubt about that. She told you a lot about, "Well, sometimes there are reasons why delayed reporting happens," but did she tell you anything about why delayed reporting in this case didn't happen? And the answer to that is no.

She's a great speaker. She has a lot of information, but when you shift (sic) through that, what does she tell you about this case? This defendant? Because, remember, every child is different, every case is different. What does she actually tell you about this case? And the answer to that is very little. She can't tell you why [RR] delays reporting[.]

[¶14] In the State's rebuttal closing argument, the prosecutor responded by discussing at length Ms. Tonkel's testimony concerning the reasons for delayed reporting and correlating those reasons to the evidence the jury heard concerning RR's circumstances. Defense counsel did not object.

[¶15] The jury found Mr. Meece guilty on both counts of second-degree sexual abuse of a minor, and the district court entered judgment and sentenced him to a prison term of eight to thirteen years on each count, to be served concurrently.

## STANDARD OF REVIEW

[¶16] Mr. Meece contends the prosecutor committed misconduct during his opening statement and closing argument. Because Mr. Meece did not object to either instance, we review for plain error. *King v. State*, 2023 WY 36, ¶ 33, 527 P.3d 1229, 1242 (Wyo. 2023). To establish plain error, Mr. Meece "must show (1) the record is clear about the incident alleged as error; (2) a violation of a clear and unequivocal rule of law; and (3) he was denied a substantial right resulting in material prejudice." *Id.* (quoting *Ridinger v. State*, 2021 WY 4, ¶ 33, 478 P.3d 1160, 1168 (Wyo. 2021)).

## DISCUSSION

[¶17] We have defined prosecutorial misconduct as follows:

Prosecutorial misconduct is a prosecutor's improper or illegal act (or failure to act), especially involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment. Prosecutorial misconduct claims are not intended to provide an avenue for tactical sandbagging of the trial courts, but rather, to address gross prosecutorial

4

improprieties that have deprived a criminal defendant of his or her right to a fair trial. A prosecutor's conduct is not misconduct unless he knew or should have known it would deprive the defendant of the right to a fair trial. It is something more than evidentiary error. We distinguish prosecutorial misconduct from evidentiary error because otherwise, any evidentiary error which favors the State would be considered prosecutorial misconduct.

*King*, 2023 WY 36, ¶ 16, 527 P.3d at 1238 (cleaned up).

### I. There was no plain error committed in the State's opening statement.

[¶18]   During the State's opening statement, the prosecutor told the jury:

I anticipate that as part of that investigation, you'll hear about [RR] submitting to a forensic interview where she goes and provides a detailed account by someone who's trained in dealing with these types of situations where you have a child victim or witness to get their side of the story.

[¶19]   Mr. Meece contends this statement was misconduct because "[w]hile the State said that they would not offer Ms. Tonkel as an expert, they referenced her expertise in their opening." Because the record clearly reflects the incident alleged as error, the first prong of the plain error analysis is met. Mr. Meece cannot, however, show that this alleged error violated a clear and unequivocal rule of law.

[¶20]   First, what Mr. Meece is truly claiming is that the State strayed from its pretrial designation of Ms. Tonkel's testimony. That is an evidentiary error, not misconduct. *King*, 2023 WY 36, ¶¶ 16, 31, 527 P.3d at 1238, 1241-42 (rejecting argument that prosecutor's attempt to elicit expert testimony in violation of case management order was misconduct and instead treating it as an alleged evidentiary error). Moreover, the prosecutor's statement during opening aligned with the State's witness designation for Ms. Tonkel, which said, in part, that she "may testify regarding her education, training and experience in the area of forensic interviewing, [and] her interview of the victim in this case[.]"Mr. Meece has therefore not established that the prosecutor's statement violated a clear and unequivocal rule of law.

### II. There was no plain error committed in the State's closing argument.

[¶21]   Mr. Meece contends the following argument made during the State's rebuttal closing was misconduct:

5

We've heard test – or [defense counsel] brings to your attention Ms. Tonkel's testimony; how she's able to provide information concerning delayed disclosures, what delayed disclosure is, and what are causes for delayed disclosures. Let's consider to what Ms. Tonkel did testify to. Again, go back to Instruction Number 4 and draw reasonable inferences from the evidence that has been presented to you.

Ms. Tonkel talked about a reason for delayed disclosure is the relationship between the offender and the child. Consider the relationship between this offender and the child; a close relationship, one [RR] revered until things went south. The nature of that relationship was absolutely a contributing factor to that delayed disclosure. You heard the evidence, you heard from Ms. Tonkel. Draw reasonable inferences to reach that conclusion.

Another consideration for why disclosures are delayed is social development. As Ms. Tonkel testified, all these kids are different, they all approach the world differently, they see it through different eyes at various stages of development.

Curiously, Ms. Tonkel talked about the fifth grade as being a time when these delayed disclosures will often come forward because they might have some type of sex education class. This disclosure occurred last year. [RR's] presently in the sixth grade, meaning last year, she was in the fifth grade.

Looking to the reasons why Ms. Tonkel testified that there are delayed disclosures corresponds to this case with respect to the victim's age at the time of that disclosure.

Ms. Tonkel further testified about reason[s] for those delayed disclosures: Fear of being believed. Ladies and gentlemen, we're here in court now testing [RR's] account of what happened. Another reason was fear of what might happen to the offender. And she characterize (sic) this in a couple different ways. One, the offender might be some type of a breadwinner in the household; or two, mother might not be one who can actually care for them if they are to report.

So what happened to the offender? We know that [RR] was very close with this defendant. We know that she resided

6

with him for a period of time. We know she had very positive views of him, but we also know that the relationship between her mother and this defendant ended, and it was only after that relationship ended that she came forward with this disclosure.

Ms. Tonkel provided circumstances of where these delayed disclosures come into play. I submit to you the evidence that has been presented to you neatly corresponds with all of those bases.

[¶22] Mr. Meece asserts that through this argument the State relied on Ms. Tonkel to tell the jury that R.R.'s disclosure "had all the hallmarks of truth given her expertise in delayed disclosures." He contends this was improper because it amounted to vouching for RR's credibility. He further contends the State argued matters not in evidence "by saying that R.R.'s nature of disclosure was truthful because it bore the hallmarks of delayed disclosure." The first prong of our plain error review is met because the record is clear as to the incident alleged as error. As with his first claim of misconduct, however, Mr. Meece cannot show that this alleged error violated a clear and unequivocal rule of law.

[¶23] Vouching occurs when a prosecutor offers his opinion of a witness's credibility, as distinguished from when he infers credibility from the same evidence the jury has before it. *Byerly v. State*, 2019 WY 130, ¶ 21, 455 P.3d 232, 242 (Wyo. 2019) (citing *Collins v. State*, 2015 WY 92, ¶ 36, 354 P.3d 55, 64-65 (Wyo. 2015)). In the above-quoted argument, the prosecutor made no reference to or comment on RR's credibility. He instead asked the jury to consider Ms. Tonkel's testimony and correlate that to the evidence it heard concerning RR's circumstances. We have previously addressed much the same scenario and held it did not constitute impermissible vouching.

[¶24] In *Budig v. State*, a psychologist testified to the nature of disclosures by child victims of sexual abuse, and the prosecutor argued the evidence showed that was what happened in that case. 2010 WY 1, ¶ 16, 222 P.3d 148, 154-55 (Wyo. 2010). On appeal, the defendant argued "that by saying that the behaviors described by Dr. Lindberg are 'exactly what happened' in this case, the prosecutor gave more credibility to the victims['] testimony, thereby improperly vouching for their credibility." *Id.*, 2010 WY 1, ¶ 17, 222 P.3d at 155-56. We rejected the argument.

After reviewing the entire record on appeal, and particularly the trial transcripts, we find that the prosecutor's comments relating the victims' actions to the general behaviors described by Dr. Lindberg were not tantamount to vouching for the victims' credibility. The prosecutor's statements merely informed the jury about the relevance of

7

Dr. Lindberg's testimony and suggested how that testimony might assist the jury in determining the facts at issue. Such use of expert testimony is proper. *See Lessard v. State*, 719 P.2d 227, 233-34 (Wyo. 1986) (expert testimony as to why sexual assault victim would ask assailant not to tell about sexual encounter was admissible in that it did not constitute testimony with respect to veracity of victim, but rather assisted jury in understanding evidence).

*Id.*, 2010 WY 1, ¶ 18, 222 P.3d at 156.

[¶25] Given our clear precedent, it is again apparent that what Mr. Meece is truly claiming is that the State's closing argument strayed from its pretrial designation of Ms. Tonkel's testimony. But, as we noted above, that is an evidentiary error, not misconduct. *King*, 2023 WY 36, ¶¶ 16, 31, 527 P.3d at 1238, 1241-42. Mr. Meece has not challenged the admissibility of the evidence on appeal or offered any analysis of its admissibility. Moreover, although Mr. Meece objected to the State's initial examination of Ms. Tonkel concerning delayed disclosures, defense counsel was the first to ask Ms. Tonkel about a reason for delayed disclosures, and he did not object when the State followed up with a more extensive inquiry into those reasons. The evidence concerning the reasons for delayed reporting was thus admitted without objection, and the prosecutor was free to comment on it and suggest reasonable inferences from it. *Bogard v. State*, 2019 WY 96, ¶ 19, 449 P.3d 315, 321 (Wyo. 2019) (citing *Teniente v. State*, 2007 WY 165, ¶ 30, 169 P.3d 512, 524 (Wyo. 2007)). Mr. Meece has therefore failed to establish that the prosecutor's statement violated a clear and unequivocal rule of law.

[¶26] Affirmed.