# IN THE SUPREME COURT, STATE OF WYOMING

## 2025 WY 58

APRIL TERM, A.D. 2025

May 23, 2025

GABRIEL LEE TESTERMAN,

Appellant
(Defendant),

v.

S-24-0203

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Laramie County*
The Honorable Robin S. Cooley, Judge

*Representing Appellant:*
    H. Michael Bennett, Bennett Law Group, P.C., Laramie, Wyoming.

*Representing Appellee:*
    Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; Kristine D. Rude, Assistant Attorney General. Argument by Ms. Rude.

*Before FOX, C.J., and BOOMGAARDEN, FENN, JAROSH, JJ, and BLUEMEL, District Judge.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**JAROSH, Justice.**

[¶1]     A jury found Gabriel Lee Testerman guilty of one count of first-degree sexual assault.  On appeal, Mr. Testerman argues the prosecutor committed misconduct by eliciting prior bad acts evidence without proper notice and by vouching for the credibility of three witnesses, thereby depriving him of a fair trial.  We affirm.

## ISSUES

[¶2]     Mr. Testerman asserts three issues on appeal and the State advances four issues.  We find the following issues dispositive:

1.  Did the district court err by admitting unnoticed evidence of prior bad acts?

2.  Did the prosecutor commit misconduct by vouching for three witnesses during closing argument?

3.  Did cumulative error deprive Mr. Testerman of a fair trial?

## FACTS

[¶3]     Mr. Testerman and CB became friends at work.  On April 25, 2022, they met at a bar for drinks, and later ended up at Mr. Testerman's house.  At Mr. Testerman's house, after only "one or two sips" from a drink he made her, CB became disoriented, dizzy, and "perhaps blacked out."  As she woke up some time later, Mr. Testerman was allegedly penetrating her vagina first with his fingers, and then with his penis.  CB got up, gathered her belongings, and left.  CB reported the assault to authorities four days later and, while investigating, Detective Nick Morgan reached out to Mr. Testerman's former girlfriend, CM.

[¶4]     According to CM, she and Mr. Testerman lived together before ending their relationship at the end of summer 2021.  CM also told Detective Morgan about an incident near the end of their relationship where Mr. Testerman forced CM to engage in anal sex, using a "spreader bar" between her legs after she had fallen asleep.  CM had not reported this assault before being contacted by Detective Morgan.

### Information/Pretrial

[¶5]     On August 30, 2022, the State charged Mr. Testerman with three counts of sexual assault in the first degree in violation of Wyo. Stat. Ann. § 6-2-302(a)(1) (2023).  Counts I and II related to the alleged assault of CB, while Count III related to the alleged assault of CM.

1

[¶6]    On November 3, 2022, the State filed its *Notice of Intent to Offer Evidence Pursuant to WRE 404(b)*, with a supporting brief.  There, the State declared its intent to introduce Wyoming Rule of Evidence (WRE) 404(b) evidence that showed knowledge and lack of mistake or accident.  The State included eight specific acts in its notice relating to Mr. Testerman and CM's sexual relationship.  The acts included blindfolding CM, choking CM, and tearing CM's tights/hosiery.  The State also included verbal conversations between Mr. Testerman and CM about their sex life, and what would or would not be acceptable between them.  The State explained the acts were being introduced to show the "boundaries of consent" as they related to sex in the couple's relationship.

[¶7]    On November 21, 2022, Mr. Testerman waived his right to a speedy trial and requested a continuance.  On February 7, 2023, the district court held a hearing on the noticed Rule 404(b) evidence.  The State argued the noticed acts would "outline the parameters" of consensual acts between Mr. Testerman and CM.  Specifically, the State argued it wished to offer the acts to show lack of mistake, knowledge, and motive, to establish that the sexual contact and intercourse on the night of the assault contrasted with Mr. Testerman and CM's typical consensual sexual activity.  Mr. Testerman conceded to admission of seven out of the eight acts offered by the State — his lone objection was that evidence of him asking to tear off CM's tights/nylons was not relevant to show a motive for later ripping CB's leggings.  After analyzing that prior act under *Gleason,* the district court held all eight noticed acts were admissible under Rule 404(b).[1]

[¶8]    At trial, both victims and Mr. Testerman testified.  The State's case relied on both victims' testimony, with CM and CB each testifying about her relationship with Mr. Testerman and each alleged assault.

### CB's Testimony

[¶9]    CB testified first.  Mr. Testerman and CB met at work, and became friends.  In April 2022, they met for drinks at a Cheyenne bar.  CB testified they stayed at the bar for about two hours, and each drank several drinks before driving separately to Mr. Testerman's home.  Mr. Testerman did not object to the testimony about him driving after drinking.

---

[1] Because uncharged misconduct evidence carries an inherent danger of prejudice, trial courts employ a mandatory procedure for testing its admissibility, using a four-part test:  (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request, the trial court must instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.  *See Gleason v. State,* 2002 WY 161, ¶ 18, 57 P.3d 332, 340 (Wyo. 2002).  On appeal, Mr. Testerman does not challenge the district court's application of *Gleason.*

[¶10]  At Mr. Testerman's home, after only "one or two sips" from a drink he made her, CB became disoriented, dizzy, and "blacked out."  Before blacking out, she texted a friend for a ride.  As she woke up some time later, she continued to text and call her friend.  During this time, Mr. Testerman penetrated her vagina with his fingers.  She finally texted her friend, "Help."  She testified that Mr. Testerman then inserted his penis into her vagina, and she protested.  She was able to move away from Mr. Testerman, which knocked him over.  She then gathered her belongings and left.  CB reported the assault four days later.

### CM's Testimony

[¶11]  CM testified after CB.  She and Mr. Testerman became acquainted through mutual friends and Facebook chats.  She testified their relationship moved quickly, and they moved in together after about a month of dating.  As things progressed, CM testified Mr. Testerman told her he "had been married four times, and … that he hadn't treated women very well in the past, that I would probably hear that[.]"  Mr. Testerman objected that this testimony was improper Rule 404(b) evidence.  The district court did not rule on the objection but, because the testimony was not responsive to the question, told CM to "listen carefully to the question and respond only to the question."  Mr. Testerman also told CM he was sexually assaulted as a child.  Mr. Testerman objected to this testimony based on Rule 404(b) and relevance.  The district court overruled the objection.

[¶12]  CM continued to testify, and relayed that her and Mr. Testerman's conversations included the topics of sex and sexual preferences.  Mr. Testerman showed CM "sex toys or devices" he liked to use, including handcuffs, mouth pieces, and a spreader bar that attaches to a person's legs and locks them in a spread position.  Mr. Testerman and CM discussed what CM was willing to do sexually, and what would be a "hard no."  CM testified that during their relationship, she allowed Mr. Testerman to tie her up and blindfold her during sex, but use of the spreader bar was a "hard no."  CM testified that Mr. Testerman told her he had belonged to a swingers group called the "Body Snatchers" and the members all had coffin tattoos.  When Mr. Testerman asked if CM might be willing to swap sexual partners, that was also a "hard no."  Mr. Testerman did not object to any of this testimony.

[¶13]  CM testified that in summer 2021, she began thinking about moving out of Mr. Testerman's home.  Although they "had a good time," and even commingled their children in the home, CM explained Mr. Testerman "started getting weird with my kids," and had inappropriate sexually charged conversations in front of them.  Mr. Testerman did not object to this testimony.

[¶14]  On July 31, 2021, the couple attended a Cheyenne Frontier Days concert and drank alcohol.  CM "crashed on the bed" when they got home and, when she woke up, realized she was naked with her hands tied behind her back, lying on her stomach, and could not move her legs.  She realized the spreader bar was attached to her legs.  CM testified she

"blacked out," but woke up again to Mr. Testerman "spitting on [her] back." She testified he then initiated anal sex. CM testified she said "no" and asked him to stop, but he did not respond or stop.

[¶15] Following the assault, CM tried to "maintain the routine," but moved out in late August 2021. She testified it was difficult because "[w]e still had the kids the rest of the summer here and there, and so getting, especially [Mr. Testerman's daughter] back to her mom." CM testified Mr. Testerman's daughter "kept saying she wanted to go home, and he wouldn't let her go home." Mr. Testerman did not object to this testimony.

[¶16] Though CM did not immediately report the sexual assault, she "knew" she had been "violated." She also explained she was concerned about humiliating the children if they found out about the assault, and that she did not trust anybody because Mr. Testerman was a highway patrolman. CM testified Mr. Testerman told her he "kept dirt on everybody," including his friends, co-workers, and supervisors, "because you never know when your friends are going to become your enemies." Mr. Testerman did not object to this testimony. CM also testified that she believed because she agreed to other sexual activities, Mr. Testerman would "make her look bad" if she reported the assault. She worried Mr. Testerman had naked photos of her but acknowledged that none were found during the investigation. Eventually, CM reported the assault when interviewed about CB's alleged assault.

## Mr. Testerman's Testimony

[¶17] Mr. Testerman testified at trial. As to CB, he testified she consented to their sexual activity. Mr. Testerman detailed their night together, including the drinks they consumed at the bar and his home. Mr. Testerman stated he drank three drinks in ninety minutes and that he felt okay to drive home. He testified that CB did not "black out" in his home, removed her own clothes, and was an active participant in their sexual activities. Mr. Testerman asserted CB used him to get even with her friend.

[¶18] Regarding CM, Mr. Testerman testified extensively about their sex life. He testified he had used a spreader bar with other partners, but not with CM. He explained he and CM engaged in "light bondage," that was "mainly [his] thing." Mr. Testerman also testified they had anal sex, but he did not care for it. Regarding the night in question, Mr. Testerman testified he did not remember having sex with CM after the concert but that CM was not credible because she did not always remember sexual activity the next day, drank too much, and often mixed up her stories. Mr. Testerman also testified about his "Body Snatchers" coffin tattoo, and stated that he, his ex-wife, and two friends tattooed each other after a night of drinking. Although he acknowledged previously swapping sexual partners, he said the swapping was unrelated to his tattoo and the "Body Snatchers" nickname. This was, he argued, an example of CM's tendency to "mix stories."

4

[¶19]   During Mr. Testerman's cross-examination, he stated he did not recall telling CM he had treated women poorly in the past.  After the State asked how many times he had been married, Mr. Testerman said four times.  Defense counsel objected based on relevance and unnoticed Rule 404(b) evidence.  The State responded it was proper impeachment evidence because Mr. Testerman had already "laid a foundation regarding his relationships."  The court overruled defense counsel's objection and allowed the answer to stand.

### Closing Argument

[¶20]   During closing, the State detailed the victims' testimony.  The State listed the elements of the crimes charged and discussed how inferences from each victim's testimony supported its case.  After recounting the testimony, the State emphasized the importance of credibility to the case and explained that the jury was charged with determining "who's telling the truth."

[¶21]   Mr. Testerman's counsel discussed the victims' credibility during closing and, as he did in his opening statement, declared their testimony was not credible.  Defense counsel argued no independent evidence supported either CM's or CB's testimony.  He also intimated that the State only filed the charge related to CM's assault to bolster the charges involving CB, and that CM was motivated "to help out [CB], to help out the ladies."

[¶22]   In rebuttal closing argument, the State argued many of Mr. Testerman's arguments were "distractions" and maintained Mr. Testerman was essentially a "professional witness," having testified for almost twenty years in traffic stops and other cases where his word was the main evidence.  The State argued Mr. Testerman had "lots of time" to prepare his testimony.  The State also explained that, like Mr. Testerman, Detective Morgan was a member of law enforcement and, "… he did a good job.  He was honest, spilled the beans."  The State characterized Mr. Testerman as both "Trooper Testerman" and "behind-closed-doors Testerman," further describing him as:

> A man who was Dr. Jekyll and Mr. Hyde.  He's got a dark side, and these women experienced it.  They opened that door.  They opened the bedroom door for you, and they showed you what was going on.  And because they do that, I'm going to ask you real simple.  Believe them.  Just believe them.  Not because they're women.  Not because of hashtag metoo [#metoo].  Not because of anything else, but because they're believable.  Believe them and convict him.  Thank you.

Mr. Testerman did not object to any portion of the State's rebuttal.

**Verdict, Judgment, and Sentence**

[¶23]  The jury found Mr. Testerman not guilty of Counts I and II related to the alleged assault of CB, but guilty of Count III related to the assault of CM.  The court sentenced Mr. Testerman to ten to fifteen years in prison.  This appeal followed.  More facts will be elicited below as necessary.

## DISCUSSION

### I.  Evidentiary Error/Prosecutorial Misconduct

[¶24]  Mr. Testerman argues the prosecutor committed misconduct when he introduced eight instances of alleged unnoticed Rule 404(b) evidence during trial.  In response, the State asserts the instances should be reviewed for evidentiary error, not for potential prosecutorial misconduct.  We agree with the State.

[¶25]  Prosecutorial misconduct is "'[a] prosecutor's improper or illegal act (or failure to act), esp[ecially] involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'" *King v. State,* 2023 WY 36, ¶ 16, 527 P.3d 1229, 1238 (Wyo. 2023) *(quoting Craft v. State*, 2013 WY 41, ¶ 13, 298 P.3d 825, 829 (Wyo. 2013)).  A prosecutor's actions are not misconduct unless he "knew or should have known [it] would deprive the defendant of the right to a fair trial[.]" *Id*. (quoting *McGinn v. State,* 2015 WY 140, ¶¶ 51-52, 361 P.3d 295, 306-07 (Wyo. 2015) (providing a non-exhaustive list of the types of conduct we have found to constitute prosecutorial misconduct) (other citation omitted)).  Prosecutorial misconduct is "something more than evidentiary error." *Id.* (quoting *McGinn,* ¶ 50, 361 P.3d at 306).  Otherwise, "any evidentiary error which favors the State would be considered prosecutorial misconduct." *Id.* (quoting *Dixon v. State*, 2019 WY 37, ¶ 37, 438 P.3d 216, 231 (Wyo. 2019) (other citation omitted).

[¶26]  Here, the eight instances alleged as unnoticed Rule 404(b) evidence do not rise to the level of potential prosecutorial misconduct.  Specifically, Mr. Testerman fails to allege or establish the type of "gross prosecutorial improprieties" that would deprive him of a fair trial.  Only three of the witness statements were elicited by the prosecutor, and only one was mentioned in the State's closing argument.[2]  *See King,* ¶ 17, 527 P.3d at 1238. Therefore, we will analyze all eight instances as alleged evidentiary errors.  *Id.*

---

[2] Seven of the contested statements were made during CM's direct testimony.  CM's responses to direct examination questions were often narrative, lengthy, and sometimes non-responsive, even when the questions called for a short answer.  Moreover, the three elicited statements were introduced to establish evidence relevant to the charged offenses, not to highlight Mr. Testerman's character — the State asked CB how much alcohol Mr. Testerman drank the night of her assault and asked CM about photos of her being blindfolded in order to establish the *victims' motives* for not immediately reporting the assaults.  Further, testimony about Mr. Testerman's tattoo and a swinger's club aimed to establish context for evidence

6

[¶27]   This Court reviews evidentiary rulings for an abuse of discretion.  *Baker v. State,* 2022 WY 106, ¶ 12, 516 P.3d 479, 481 (Wyo. 2022) (quoting *Klingbeil v. State*, 2021 WY 89, ¶ 32, 492 P.3d 279, 286 (Wyo. 2021)).   "An abuse of discretion occurs when the deciding court could not have reasonably concluded as it did."  *Id.* (quoting *Gilbert v. State,* 2022 WY 62, ¶ 15, 509 P.3d 928, 932 (Wyo. 2022)) (quotation omitted).   "A trial court's rulings on the admissibility of evidence are entitled to considerable deference, and as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal.  The appellant bears the burden of showing an abuse of discretion."  *Id.,* ¶ 12, 509 P.3d at 482 (quoting *Putnam v. State,* 2020 WY 133, ¶ 29, 474 P.3d 613, 621-22 (Wyo. 2020)) (other quotation and citation omitted).   If we find the evidence was admitted in error, we then consider whether the error was prejudicial.  *Dixon*, ¶ 40, 438 P.3d at 231.

[¶28]   Rule 404(b) governs the admissibility of bad acts evidence:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

W.R.E. 404(b).  Evidence falling within the scope of Rule 404(b) "may include, but is not limited to, any conduct which may bear adversely on the jury's judgment of the character of a person, and it is not limited to other crimes."  *Cox v. State*, 2020 WY 147, ¶ 20, 477 P.3d 82, 85-86 (Wyo. 2020) (quoting *Putnam*, ¶ 30, 474 P.3d at 622).  "Because of the inherent danger for prejudice associated with [Rule 404(b)] evidence, there is a mandatory procedure that must be followed before that evidence may be admitted."  *King,* ¶ 20, 527 P.3d at 1239 (quoting *Birch v. State,* 2018 WY 73, ¶ 19, 421 P.3d 528, 535 (Wyo. 2018)) (other citation omitted).  That procedure is, once a defendant files a pretrial demand for notice of the State's intent to introduce Rule 404(b) evidence, the State must identify the evidence, and the district court must hold a *Gleason* hearing, and conduct an exacting analysis of four factors.  *Id.* (other citations omitted); *see also* FN 1, supra.

---

allowed by the district court's pretrial order that Mr. Testerman asked CM about partner swapping, and she declined.

[¶29]   Although the district court addressed other instances of Rule 404(b) evidence prior to trial, the instances Mr. Testerman alleges as error on appeal were not included in that grouping.  Thus, the first step in our analysis is to determine whether each instance alleged as error qualifies as unnoticed Rule 404(b) evidence.  For those instances we determine *not to be* unnoticed Rule 404(b) evidence, where there is no objection, this Court analyzes for plain error.  *Garriot v. State,* 2018 WY 4, ¶ 21, 408 P.3d 771, 780 (Wyo. 2018).  Under a plain error standard of review, a defendant must show (1) the record is clear about the incident alleged as error; (2) a violation of a clear and unequivocal rule of law; and (3) the defendant was denied a substantial right resulting in material prejudice.  *Meece v. State,* 2023 WY 60, ¶ 16, 530 P.3d 597, 600 (Wyo. 2023).

[¶30]   For those instances that *do* qualify as Rule 404(b) evidence, and because Mr. Testerman filed a pretrial demand for Rule 404(b) evidence, we review the district court's admission for an abuse of discretion.  *Vinson v. State,* 2020 WY 93, ¶ 16, 467 P.3d 1009, 1012 (Wyo. 2020); *Freer,* ¶ 11, 533 P.3d at 901.  Since those instances were distinct from the ones considered at the *Gleason* hearing and the district court did not conduct such a hearing during trial, our decision turns on prejudice.  *Vinson,* ¶ 24, 467 P.3d at 1014 ("Because it remains difficult, if not impossible, to apply the abuse of discretion standard where a Rule 404(b) issue is not squarely brought to the trial court for a full and timely *Gleason* hearing, our decision turns on whether Mr. Vinson was prejudiced.").  This Court does not apply the *Gleason* factors on appeal.  *See Santistevan v. State,* 2024 WY 17, ¶ 15, 542 P.3d 200, 205 (Wyo. 2024).  An error is prejudicial if there is a reasonable probability the verdict might have been more favorable to the defendant absent the error.  *Sullivan v. State*, 2025 WY 5, ¶ 19, 561 P.3d 780, 786 (Wyo. 2025) (internal quotation omitted).  Prejudicial error requires reversal; harmless error does not.  *Broberg v. State,* 2018 WY 113, ¶ 19, 428 P.3d 167, 172 (Wyo. 2018).

[¶31]   Of the eight instances of alleged unnoticed Rule 404(b) evidence, the state concedes that five were Rule 404(b) evidence.  The remaining three instances are:  (1) CM testified Mr. Testerman told her he had been sexually abused as a child; (2) CM testified Mr. Testerman had sexually charged conversations in front of their children; and (3) CM testified Mr. Testerman's daughter asked to return to her mother's home, and he would not let her.  Therefore, the initial question is whether these instances are actually Rule 404(b) evidence.  We conclude they are not and discuss each in turn below.

## A.  The three statements that were not unnoticed Rule 404(b) evidence.

### 1.      *Instances 1 and 2:  Sexual Conversations in front of Kids/Daughter wants to go home.*

[¶32]   At trial, CM testified about Mr. Testerman having a "sexually charged conversation in front of the children."  CM also testified Mr. Testerman would not let his daughter go back to live with her mother. Mr. Testerman argues both statements were wrongfully

admitted prior bad acts. As to the former, he asserts it was used to show he "was so hyper-sexualized that he couldn't refrain from sexually charged conversations." As to the latter, he asserts it was used to depict him as an "uncaring father." The State disagrees CM's testimony falls within the scope of Rule 404(b). Mr. Testerman did not object to these statements at trial, and we will consider them together.

[¶33] In determining whether evidence qualifies as Rule 404(b) evidence, we consider whether that act relates to "the character of a person," as stated by the rule, and study the act's "nature or quality." *Lindstrom v. State,* 2015 WY 28, ¶ 20, 343 P.3d 792, 797 (Wyo. 2015) (quoting 1 Mueller & Kirkpatrick, Federal Evidence § 4:28 (4th ed. 2013)). Yet, "[e]ven though acts and broader patterns of behavior lie behind character, describing acts is not the same thing as giving character evidence[.]" *McDowell v. State,* 2014 WY 21, ¶ 23, 318 P.3d 352, 359 (Wyo. 2014) (quoting 1 Mueller & Kirkpatrick, *Federal Evidence* § 4:23 (4th ed. 2013)).

[¶34] In both challenged statements, CM was answering questions about moving out of Mr. Testerman's home. And in both instances the court stopped her from continuing once the answers became non-responsive. The testimony related to parenting decisions, and was not used to prove Mr. Testerman's character to show he acted in conformity therewith in assaulting CM. In short, the testimony was not Rule 404(b) evidence. Mr. Testerman has not challenged the admissibility of the evidence other than on Rule 404(b) grounds. That is, Mr. Testerman makes no cogent argument on appeal that the admission of these statements violated any clear and unequivocal rule of law. It did not. Finding no error, we do not need to consider whether Mr. Testerman was materially prejudiced by the admission of either of these statements.

### 2. *History of Childhood Sexual Abuse*

[¶35] CM testified at trial that Mr. Testerman told her "he had been sexually abused as a child." CM's testimony was in response to the question, "[a]nd at a certain point in the relationship did he divulge anything deeper about his sexual desires?" This coincided with the line of questioning about Mr. Testerman and CM's sex life generally. At trial Mr. Testerman objected to the testimony on Rule 404(b) and relevance grounds, and he now argues it was unnoticed Rule 404(b) evidence, since it was not disclosed as part of the pretrial *Gleason* proceedings. Again, on appeal Mr. Testerman has not challenged the admissibility of the evidence on any ground other than Rule 404(b).

[¶36] In this instance, we find the testimony about the sexual abuse Mr. Testerman may have suffered as a child is not prior bad act evidence under Rule 404(b) evidence. It is not testimony about a prior bad act by Mr. Testerman offered to show he acted in conformity therewith; it is quite the opposite. Arguably, the district court could have considered and even perhaps excluded this evidence under Rule 404(a), which encompasses character evidence generally, and includes "evidence of a pertinent trait of [a defendant's] character

9

offered by an accused, or by the prosecution to rebut the same[.]" WRE 404(a). However, that was not the objection at trial, nor is it the argument on appeal. Accordingly, we find the district court properly overruled the objection and did not abuse its discretion.

## B. The five statements the State concedes were unnoticed Rule 404(b) evidence.

[¶37] Mr. Testerman claims, and the State concedes, the following five instances qualify as unnoticed Rule 404(b) evidence: (1) CM's testimony about being photographed without her permission; (2) CM's testimony about Mr. Testerman "keeping dirt" on others; (3) CM's testimony about partner-swapping clubs and tattoos; (4) CM's testimony about Mr. Testerman treating women badly; and (5) CB's testimony about Mr. Testerman drinking and driving. The State argues Mr. Testerman was not materially prejudiced by the admission of these statements. For the following reasons, we agree with the State.

[¶38] When considering whether evidentiary error has resulted in material prejudice, this Court considers five factors: (1) whether the evidence furnished important corroboration of other testimony; (2) whether it related to a material, consequential fact; (3) whether counsel relied on the evidence in argument; (4) whether the evidence was cumulative; and (5) the effect of any instructions given to the jury. *King,* ¶ 53, 527 P.3d at 1247. We consider each statement in turn, keeping in mind the ultimate question is whether there is a reasonable probability that Mr. Testerman's verdict would have been more favorable if the testimony had not been received.

### 1. *Inappropriate photographs/blindfolding*

[¶39] Mr. Testerman argues CM's testimony that he allegedly took pictures of CM without her permission, while she was naked and blindfolded, showed him to be "paranoid and controlling."

> CM: I didn't want videos or pictures taken of me without my clothes on, even if I wasn't tied up, but he had me tied up one time and I had the blindfold on, and he wouldn't say anything. … I'm like, Are you taking pictures? You better not be taking pictures. That's my hard no. Like, don't do that. And, again, he just didn't say anything … and then he said, I'm not taking pictures.
> Defense counsel: What about the night of July 31st, did you know whether or not he was taking pictures of you then?
> CM: I did not, but I suspected he did.

Mr. Testerman did not object to these statements at trial.

[¶40]   We conclude Mr. Testerman was not materially prejudiced by this testimony.  First, the State gave pretrial notice, to which Mr. Testerman did not object, that it intended to introduce evidence that CM consented to being blindfolded.   Further, the testimony elaborated on other evidence that was already properly admitted and corroborated Mr. Testerman's own testimony that bondage was "mainly [his] thing," and that he had tied up and blindfolded CM.  *See Bromley v. State,* 2007 WY 20, ¶ 29, 150 P.3d 1202, 1212 (Wyo. 2007) (finding testimony concerning uncharged misconduct of the same nature as testimony considered in a pretrial hearing).   The testimony was also given as background, did not relate to a material or consequential fact, and was not relied on by counsel in closing argument.  Mr. Testerman attempted to use CM's testimony to his advantage when, during cross-examination, CM admitted the investigator did not find any photographs or videos of her.  In closing, Mr. Testerman argued the absence of photographs/videos showed CM should not be believed.  There was no instruction given to the jury specific to this comment. Finally, during oral argument, Mr. Testerman's counsel conceded he was not contesting the admission of CM being blindfolded.  Mr. Testerman has not carried his burden to demonstrate material prejudice related to this testimony.

### 2.  *"Keeps dirt on others"*

[¶41]   CM testified that Mr. Testerman "keeps dirt" on everyone, which Mr. Testerman argues was used to characterize him as "paranoid and controlling."

[¶42]   We also conclude Mr. Testerman was not materially prejudiced by the admission of this testimony.  First, the State did not elicit this testimony.  CM volunteered her statement while narratively responding to a line of questions about her reasons for initially not reporting the assault.  The State followed CM's statement and asked if she "took that to heart when it came to thinking about reporting [the assault]?" Here, the State sought to clarify CM's reasons for not immediately reporting the assault, not to argue about Mr. Testerman's character or actions.  CM explained she delayed reporting because she did not want to subject herself, or her or Mr. Testerman's children to "humiliation."   This testimony was also dissimilar to the crimes charged, making the risk low that the jury would convict Mr. Testerman by drawing comparisons or making improper inferences.  *See King,* ¶ 53, 527 P.3d at 1247 (finding although the State relied on challenged evidence in closing, the evidence was not similar to the crimes charged, decreasing the likelihood the jury made improper inferences or used the evidence to place the defendant in a negative light). Finally, the prosecutor did not argue this point in closing.  Mr. Testerman was not materially prejudiced by the admission of this testimony.

### 3.  *Swingers' club/tattoos*

[¶43]   CM testified that Mr. Testerman "has a tattoo on his right hip that is in the shape of a coffin," with the letters BS in the coffin, which stands for "Body Snatchers."   She explained "one of his exes and him were in … I don't know if it's a club … but they called

11

it the body snatchers, and they were a swingers group that would change partners." She also testified Mr. Testerman liked to "change partners" and "that's something he had done with other girls." Mr. Testerman argues this evidence improperly demonstrated his "unconventional sexual fetishes."

[¶44] Mr. Testerman was not prejudiced by the admission of this evidence, primarily because it was cumulative of the State's pretrial notice of evidence it intended to introduce and of the same nature of Mr. Testerman's own testimony. Prior to trial, the State gave notice it intended to introduce evidence that included Mr. Testerman's request of CM to swap sexual partners, but that she refused to do so. Mr. Testerman did not argue against the admission of this request during the pretrial *Gleason* hearing. In addition, his own trial testimony corroborated CM's testimony when he testified that he "swapped partners," but not with CM, although they talked about it. He also testified about his tattoo and explained it in detail, including describing it as a "Body Snatchers" tattoo and explaining the reasons for and origin of the tattoo. Given the district court's pretrial admission of Rule 404(b) evidence regarding partner swapping, and Mr. Testerman's own testimony about partner swapping and his tattoo, Mr. Testerman was not materially prejudiced by CM's testimony.

### 4. Married four times/treated women badly

[¶45] Mr. Testerman argues broadly that CM's testimony that Mr. Testerman told her he "hadn't treated women very well in the past" and that he had been married four times was prejudicial and intimated he had a "dark side." This testimony by CM was brief. The testimony was cut off by Mr. Testerman's objection, after which the district court reminded CM to answer only the question asked. She never further elaborated on whether or how Mr. Testerman treated women poorly in the past.

[¶46] In addition, after CM's testimony, Mr. Testerman also testified about his past relationships. During his cross-examination, the court allowed him to testify to the same evidence as CM, over defense counsel's objection, in order to impeach his direct testimony about his relationships. On appeal, Mr. Testerman does not assert the district court's admission of Mr. Testerman's testimony was error, including his own testimony that he had been married four times. The prejudice from admission of CM's statements, if any, was negligible. More significantly, Mr. Testerman provides no cogent argument that the admission of this part of CM's testimony was materially prejudicial. For these reasons, we conclude Mr. Testerman was not materially prejudiced by these two statements.

### 5. Drove home after drinking

[¶47] Mr. Testerman challenges the admission of CB's statement on direct examination when she testified that Mr. Testerman drank at the bar and then drove home. Mr. Testerman claims the district court erred in admitting this testimony, and that the State improperly referred to the same statements in closing argument. While the State does not

dispute the testimony falls within the scope of prior bad acts evidence, it maintains Mr. Testerman was not materially prejudiced by the admission of this evidence.

[¶48] Importantly, the jury acquitted Mr. Testerman of the charges associated with CB, which demonstrates, in part, a lack of prejudice resulting from CB's testimony. *See Broberg*, ¶ 20, 428 P.3d at 172 (finding a jury acquittal on charges relating to specific facts alleged as improper Rule 404(b) testimony demonstrated a lack of prejudice). Further, this evidence was offset because Mr. Testerman also testified, in detail, to the same information during his direct examination. He specified the number of drinks he had at the bar, including the amount of alcohol in each drink. He also did not dispute that he drove home after drinking at the bar, thus allowing the State to cross-examine him about the number of drinks he consumed, and whether or not he was drunk. Finally, this testimony was unrelated to any material, consequential fact at trial. Mr. Testerman was not materially prejudiced by this testimony because the jury heard the same information directly from Mr. Testerman.

## II.     Vouching/Prosecutorial Misconduct

[¶49] Mr. Testerman next argues the State made two comments during closing argument that constituted improper vouching by the prosecutor: First, while discussing the testimony of Detective Morgan, and second, as the prosecutor recapped the victims' testimony during rebuttal closing. Mr. Testerman did not object to either comment at trial.

[¶50] When determining whether a prosecutor committed misconduct during closing arguments, "we review the entire argument, and do not isolate discrete parts of the argument that may be taken out of context." *King*, ¶ 44, 527 P.3d at 1245 (quoting *Fairbourn v. State*, 2020 WY 73, ¶ 89, 465 P.3d 413, 433 (Wyo. 2020) (cleaned up). Closing arguments "… must be based upon the evidence submitted to the jury." *Dysthe v. State*, 2003 WY 20, ¶ 24, 63 P.3d 875, 884 (Wyo. 2003). Attorneys are afforded wide latitude during closing argument and may comment on and suggest reasonable inferences from all the evidence admitted during trial. *Berry v. State*, 2023 WY 75, ¶ 49, 533 P.3d 474, 488 (Wyo. 2023). However, there are limits on a prosecutor's closing arguments. "[I]t is improper for a prosecuting attorney to inject his opinion as to the weight of the evidence in arguing to the jury" because "a prosecutor may be seen as an authority whose opinion carries greater weight than the jury's opinion." *King*, ¶ 44, 527 P.3d at 1245 (quoting *Harper v. State*, 970 P.2d 400, 405 (Wyo. 1998) (citing *McLaughlin v. State*, 780 P.2d 964, 967 (Wyo. 1989), and *Mintun v. State*, 966 P.2d 954, 960 (Wyo. 1998)). As to the credibility of witnesses and the guilt of the accused, those are questions for the jury to resolve. *Id.,* ¶ 45, 527 P.3d at 1245.

[¶51] Because Mr. Testerman did not object at trial to either instance of alleged improper vouching, we review his arguments on vouching for plain error. "We are reluctant to find plain error in closing arguments 'lest the trial court becomes required to control argument

because opposing counsel does not object.'" *Dixon*, ¶ 39, 438 P.3d at 231 (quoting *Trujillo v. State*, 2002 WY 51, ¶ 4, 44 P.3d 22, 24 (Wyo. 2002)). "Timely objection is the proper way to correct improper closing arguments, because it allows the trial court to weigh the impact of the comments and assess curative measures." *Id.,* (quoting *Dice v. State*, 825 P.2d 379, 384 (Wyo. 1992) (internal quotation marks omitted)).

[¶52] Mr. Testerman has met the first prong of the plain error test because both incidents alleged as error are clearly reflected in the trial transcript. The second prong requires us to examine whether there has been a transgression of a clear and unequivocal rule of law.

[¶53] Vouching occurs when a prosecutor offers his opinion of a witness's credibility, as distinguished from when he infers credibility from the same evidence the jury has before it. *Byerly v. State*, 2019 WY 130, ¶ 21, 455 P.3d 232, 242 (Wyo. 2019) (quoting *Collins v. State*, 2015 WY 92, ¶ 36, 354 P.3d 55, 64-65 (Wyo. 2015) (quotation omitted)). "We judge the challenged comments not in isolation but in the context of the prosecutor's entire argument, considering the context of the comments and comparing them with the evidence produced at trial." *Berry,* ¶ 44, 533 P.3d at 487 (quoting *Lafond v. State*, 2004 WY 51, ¶ 15, 89 P.3d 324, 329 (Wyo. 2004) (citation omitted)).

## A. Comments Made Regarding Detective Morgan

[¶54] During closing, regarding the testimony of Detective Morgan, the prosecutor said, "You saw Nick Morgan testify, and he did a good job. He was honest, and spilled the beans."

[¶55] Mr. Testerman asserts this was improper vouching for the credibility of Detective Morgan. We see the prosecutor's comment differently, and do not find it to be improper vouching. Certain statements can amount to vouching. In *Guy v. State,* we found vouching occurred when the prosecutor stated, "I stand behind Sergeant Brown and the investigation that was conducted in this matter." 2008 WY 56, ¶ 20, 184 P.3d 687, 694 (Wyo. 2008). Similarly, in *Fennell v. State,* vouching also occurred when the prosecutor said, "We know [Mr. Fennell delivered cocaine] because the agents did their job incredibly well," and "Again, fortunately, these officers and agents are incredibly good at their job." 2015 WY 67, ¶ 42, 350 P.3d 710, 725 (Wyo. 2015).

[¶56] In both of those cases, this Court considered the statements as assertions of the prosecutors' personal opinions or experience, "thus creating the risk the jurors would view [the prosecutor] as an authority whose knowledge and opinions carried greater weight than their own." *Fennell,* ¶ 43, 350 P.3d at 725. However, in *Burton v. State,* where the prosecutor testified the state's witness was "blatantly honest," we held that was not vouching, because the prosecutor was not confirming based on his own experience the witnesses were blatantly honest — instead, he was highlighting that the witnesses were

14

"forthright" about their drug use, notwithstanding the fact it was difficult to discuss those matters publicly. *Burton,* ¶ 35, 46 P.3d at 317.

[¶57] When stating the detective "did a good job" and "was honest, and spilled the beans," the prosecutor was not asserting his personal belief, or injecting his own opinion about whether Detective Morgan's testimony was reliable. In the context of the prosecutor's entire closing, his "did a good job" statement was part of his argument that Mr. Testerman and Detective Morgan, like other law enforcement, were experienced trial witnesses who presented well to juries. Regarding his other comment about Detective Morgan, we find it to be similar to *Burton.* Specifically, during trial, Mr. Testerman contested the thoroughness of Detective Morgan's investigation. The prosecutor's statement that Detective Morgan "was honest" and "spilled the beans" was in reference to inadequacies in the investigation that Detective Morgan admitted during his testimony. In that context, the prosecutor was not confirming from his own personal experience that Detective Morgan was honest; he was explaining how Detective Morgan had been forthright in discussing his investigation. When considering these comments in the context of the entire case, we find no improper commentary or inference that the prosecutor personally vouched for Detective Morgan's credibility. Thus, the prosecutor did not violate a clear and unequivocal rule of law.

[¶58] Mr. Testerman has not established that the prosecutor violated a clear and unequivocal rule of law in a clear and obvious way as to the statements about Detective Morgan. Consequently, he has not established plain error.

### B.    Comments Made Regarding Victims

[¶59] Mr. Testerman's second claim of vouching is based on a statement made by the prosecutor at the end of his rebuttal closing remarks: "They opened the bedroom door for you, and they showed you what was going on. And because they do that, I'm going to ask you real simple. Believe them. Just believe them. Not because they're women. Not because of hashtag metoo [#metoo]. Not because of anything else, but because they're believable. Believe them and convict him. Thank you."

[¶60] In *White v. State*, we held the comments, "Does that mean she's not believable?" and "She got up there and told you what happened, and she was honest[,]" made during the prosecutor's closing argument were not improper vouching. 2003 WY 163, ¶ 29, 80 P.3d 642, 654 (Wyo. 2003). We compared those comments to the ones made in *Dysthe v. State* and *Burton v. State.* In *Dysthe,* the prosecutor argued,

> These witnesses, despite the fact that they are users, were credible. They were very credible. They were more credible because of the very fact that they have a relationship with this Defendant. More credible because, if you couldn't tell, I

15

certainly could; they didn't like me asking them questions. They didn't want to be telling me anything.

*Id.,* ¶ 28, 63 P.3d at 886. The *Dysthe* prosecutor also argued that he had worked with investigators on the case and could "guarantee" that their investigations were not "arbitrary" and that the witnesses "had no reason to lie." *White*, ¶ 30, 80 P.3d at 654 (quoting *Dysthe,* ¶ 28, 63 P.3d at 886). In *Dysthe,* we held the comments gave the impression it was the prosecutor's opinion that the witnesses were credible. *Id.*

[¶61] In *White*, we directly compared the comments made in *Dysthe* to those in *Burton*, discussed above, ultimately concluding the comments in *Burton* were not improper because the prosecutor was pointing out the witnesses had no motivation to lie by confessing their drug use. *White,* ¶ 31, 80 P.3d at 654. In addition, we explained in *White* that, while the prosecutor's statement, viewed in isolation, could give the jury at least the impression that he was vouching for the witness's credibility, the statement needed to be viewed in the context of the entire closing:

> However, unlike *Dysthe,* the prosecutor in the instant case referred the jury to the district court's instructions previously during his argument and stated that the jury was the exclusive trier of fact, that the jury was to decide whom to believe, and that the jury was to "decide what the facts of this case are and what they are not." Nor was the comment at issue accompanied by any personal attestation of fact.

*Id.*, ¶ 32, 80 P.3d at 654-55.

[¶62] Taking all of this into consideration in this case, the prosecutor's comments, in the context of his entire closing and rebuttal closing, were similar to the comments and relevant portions of the closing statement in *White*. Specifically, near the beginning of his closing, the prosecutor told the jury, "that's where the evidence is, in the testimony. It's not what I say, it's not what defense counsel says. It's what you hear on the stand, it's what you saw on the screen, it's the exhibits that you see here today." Near the end of his closing, the prosecutor stated, "A lot of this is your measure of credibility in this case. That is your job. It's not mine to tell you who's telling the truth. It's not mine. You decide the credibility of each witness and the credibility of the evidence." Finally, at the outset of his rebuttal closing, the prosecutor stated, "I think it bears worth repeating that what the attorneys say is not testimony, all right? That's not evidence, it's argument." In addition, and as in *White*, the prosecutor's statement did not include a personal attestation of fact that CB and CM were telling the truth. Rather, the prosecutor was advocating that inferences of credibility be drawn from the testimony and evidence in the case. *See Meece*, ¶ 23, 530 P.3d at 601 ("Vouching occurs when a prosecutor offers his opinion of a witness's credibility, as distinguished from when he infers credibility from the same evidence the

16

jury has before it."). Specifically, the inference that the prosecutor asked the jury to draw was that since the victims "opened the bedroom door for you" and testified to intimate details of their sexual activity—particularly CM—they were credible. Finally, the jury in this case was specifically instructed by the district court that it was the sole judge of the credibility of the witnesses.

[¶63] When viewed in context, the prosecutor's closing rebuttal comments did not constitute improper vouching. Mr. Testerman has not established that the prosecutor violated a clear and unequivocal rule of law in a clear and obvious, not merely arguable, way. Consequently, he has not established plain error. [3]

### III. Cumulative Error

[¶64] Finally, Mr. Testerman argues the cumulative effect of the errors at trial deprived him of a fair trial. "The purpose of evaluating for cumulative error is to address whether the cumulative effect of two or more individually harmless errors has the potential to prejudice the defendant to the same extent as a single reversible error." *King*, ¶ 51, 527 P.3d at 1246-47 (quoting *Hicks,* ¶ 40, 478 P.3d at 663) (other quotations omitted). "When performing a cumulative error analysis, we consider only matters that were determined to be errors, and not any matter assigned as error but determined not to be erroneous." *Id.,* ¶ 51, 527 P.3d at 1247 (quoting *Hicks*, ¶ 40, 478 P.3d at 663).

[¶65] As detailed above, Mr. Testerman argues the prosecutor committed eight separate acts of misconduct related to Rule 404(b) evidence as well as two instances of vouching. For his cumulative error argument, he says little more than that the errors he alleges "could have very well been the difference between the verdict on Count III and another result." On review, however, we found five instances of evidentiary error in the admission of unnoticed Rule 404(b) evidence and no impermissible vouching. The question then is whether cumulatively these errors materially prejudiced Mr. Testerman. Individually, we have already concluded they did not.

[¶66] To establish cumulative error, the cumulative effect of the errors must have so prejudiced the defendant that his trial was not fair and impartial. *Schmuck v. State,* 2017 WY 140, ¶ 72, 406 P.3d 286, 309 (Wyo. 2017) (citing *Hamilton v. State*, 2017 WY 72, ¶ 7, 396 P.3d 1009, 1012 (Wyo. 2017)). We reverse a conviction only when the accumulated effect of the errors "constitutes prejudice and the conduct of the trial is other than fair and impartial." *Watts v. State*, 2016 WY 40, ¶ 23, 370 P.3d 104, 112 (Wyo. 2016) (quotation omitted).

---

[3] Although Mr. Testerman asserts an argument on appeal that the burden should be on the State to show harmless error in cases involving prosecutorial misconduct, we decline to consider the argument here, where we find no prosecutorial misconduct.

[¶67] In sum, the five unnoticed Rule 404(b) statements admitted in error are: (1) CM's testimony about Mr. Testerman "keeping dirt" on others; (2) CM's testimony about partner-swapping clubs and tattoos; (3) CM's testimony about Mr. Testerman treating women badly; (4) CB's testimony about Mr. Testerman drinking and driving; (5) CM's testimony about being photographed without her permission.

[¶68] Considering the five statements together, but in the context of the entire trial, we conclude there is no reasonable possibility that the verdict would have been more favorable to Mr. Testerman if the statements had been excluded. First, the statements were all relatively innocuous; none of the testimony related to material, consequential facts in the case. Rather, the testimony can be best understood as background related to either Mr. Testerman's relationship with CM or, in the case of drinking and driving, the events leading up to the assault of CB. In addition, Mr. Testerman himself testified about two of those subjects—partner swapping/tattoos and drinking and driving the night of the assault on CB. The testimony at issue was also brief, largely unelicited, and not referred to during closing argument, with the exception of the reference to drinking and driving before the assault of CB. However, Mr. Testerman was acquitted of the charge related to CB. Further, the statements were generally unrelated to each other in subject matter. Perhaps most importantly, the acts explained in the statements were not in any manner similar to the crimes charged—first degree sexual assault.

[¶69] Mr. Testerman has failed to carry his burden to show how admission of the testimony at issue deprived him of a fair and impartial trial. We conclude Mr. Testerman did not suffer material prejudice by the admission of the five instances of unnoticed Rule 404(b) evidence.

## CONCLUSION

[¶70] The district court did not abuse its discretion when it admitted three instances of evidence determined not to be Rule 404(b) evidence. In addition, Mr. Testerman failed to carry his burden to demonstrate he was materially prejudiced by the admission of five instances of unnoticed Rule 404(b) evidence. Finally, the state did not commit prosecutorial misconduct by vouching for three defense witnesses.

[¶71] Affirmed.